IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK G. GREEN, | No. C 12-1872 CW (PR) |
| Petitioner, | ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| v. | |
| G. SWARTHOUT, Warden, | |
| Respondent. | |
| / | |

Petitioner Frank G. Green, a state prisoner proceeding pro se, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction, in which he asserts four claims: (1) violation of the Confrontation Clause; (2) violation of Brady v. Washington, 373 U.S. 83 (1963); (3) ineffective assistance of trial counsel; and (4) ineffective assistance of appellate counsel.  Respondent has filed an answer and a memorandum of points and authorities in support thereof and Petitioner has filed a traverse.  For the reasons discussed below, the Court DENIES the petition and a certificate of appealability.

BACKGROUND

I. Procedural History

On April 11, 2008, the San Francisco County Grand Jury charged Petitioner with murder.  Clerk's Transcript (CT) at 3-4. On March 4, 2009, a jury trial commenced and, on May 13, 2009, the jury found Petitioner guilty of second degree murder.  CT at 150, 262.  On July 10, 2009, the trial court sentenced Petitioner to

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  state prison for fifteen years to life.  CT at 328-30.  Petitioner

2  appealed, asserting a Confrontation Clause claim.  On January 21,

3  2011, the California Court of Appeal affirmed the judgment in an

4  unpublished decision.  Ex. B, People v. Green, A125684; 2011 WL

5  193358 (Cal. Ct. App. Jan 21, 2011).  On April 13, 2011, the

6  California Supreme Court summarily denied review.  Ex. C.

7  Petitioner filed a petition for a writ of habeas corpus in San

8  Francisco County Superior Court, asserting claims of a Brady

9  violation and ineffective assistance of trial and appellate

10  counsel.  In a brief written order, the Superior Court denied the

11  petition.  Ex. D.  Petitioner filed petitions for a writ of habeas

12  corpus, raising these issues, in the California Court of Appeal

13  and the California Supreme Court, both of which were summarily

14  denied.  Id.  On April 16, 2012, Petitioner filed this federal

15  petition for a writ of habeas corpus.

16  II. Statement of Facts

17       The California Court of Appeal summarized the facts of this

18  case as follows:

19       The murder victim, Sherry Davis, lived in apartment number
20       602 in a six-floor apartment building at 155 Hyde Street in
         San Francisco.  Defendant was her "boyfriend," and lived with
21       her in the apartment.  According to Ashley Davis, [FN1]
         Sherry's daughter, defendant was "dominating" and
22       "controlling" with the victim, typically "ordering her
         around" and "telling her" to do things for him.  In the past,
23       defendant also verbally abused and threatened Sherry.

24            FN1  To avoid confusion we will refer to the victim
              Sherry Davis and her daughter Ashley Davis by their
25            first names.

26       Ruth Marest occupied apartment 601 in the same building,
27       next to the victim's residence.  Their apartments shared
         a common kitchen wall.  Marest was acquainted with both
         the victim and defendant.  On the afternoon of November

28

4, 2005, from her kitchen Marest heard Sherry and defendant arguing.  They argued frequently, so Marest was not "too concerned," until the argument "started to escalate" and she heard "scuffling" and heavy "bumping" against the wall.  Marest then heard a woman's voice yelling, "Help me.  Help me.  Please help me."  Marest looked out her kitchen window and saw a woman next door only 15 inches away, with her neck "against the window sill" and her head "being shaken back and forth."  She did not recognize the woman or her "distorted" voice because her throat was pressed against the window and her "head was being shaken" vigorously.  Marest also noticed that the window curtain had blood stains on it.

Suddenly, the woman was pushed out of the window, and fell to the ground "on her back, face up, on the first floor landing."  The woman's "blouse was up," and her "face was very bloody."  Marest called 911.  While she was on the phone with the operator she heard another "woman's voice" from inside the victim's apartment say, "Oh, my God, what did you do?"

Joseph Dalton, another resident of the same building in apartment number 301, heard the argument from his kitchen.  He heard a "very passive" and quiet woman's voice above him pleading for "help."  Dalton had heard the same voice before many times crying for help, so he thought, "no, not this again," and closed his kitchen window. He nevertheless continued to hear a "struggle going on," and "knew somebody was fighting up there." "There was a lot of noise and vibration," the "whole building shook," and a window was opened and closed several times.  Dalton called 911 to report that "somebody was fighting up there."  As he sat at his kitchen table next to the window he "saw something" out of corner of his eye that he thought was a shadow, but then realized was a "lady falling."  He then heard a "huge crash" on the landing of the building.  Dalton looked down and observed a woman lying on the ground "just looking up," with a "horrified look" on her face.

While he was waiting for a bus at Turk and Hyde Streets, Jeremy Brady also heard the sound of a "very loud," "intense" argument between a man and a woman emanating from the top left window of the apartment complex across the street at 155 Hyde Street.  The argument continued, with a "lot of yelling" and "screaming." As Brady looked up, he observed a "woman's buttocks j[u]tting out of a window."  The woman held onto the window sill and pulled "herself back in" two times, but was pushed out again. The third time, she was pushed completely out of the window and fell into the alley below, "screaming on the way down."  After she fell, Dalton heard a man from the window yell, "Take that, you fucking bitch."  The man was about "middle age," with "very short" hair, and appeared to be "African-American."

3

Paramedics from the San Francisco Fire Department arrived at 155 Hyde Street in response to a dispatch of a "person thrown from a window" at 2:30 p.m. . . . A single sandal and a white T-shirt with "what appeared to be blood stains" and drops on it were found in the landing area near the victim.  The victim was transported to San Francisco General Hospital, but she died the next day.

San Francisco police officers also arrived at the scene around 2:30 p.m.  Officer Mario Busalacchi "responded up to the sixth floor" of the building, and noticed that the "door to room 602 was ajar."  Officer Busalacchi entered the room, which was unoccupied.  He noticed "blood throughout the whole apartment, on the walls, on the floor, on the windows."  Busalacchi, assisted by other officers, inspected the scene and booked evidence that was seized from the apartment.  [FN2]

    FN2  A videotape of the crime scene was also played for the jury.

Blood was found on the kitchen counter, the refrigerator, a dish towel, a shower curtain, pants, T-shirts, bathrobes, and a shoe.  According to a police inspector who investigated the scene, the blood stains were "consistent with some type of medium velocity stain, probably——consistent with somebody being struck."  "Hair swipe" stains discovered on the wall were in "a classic pattern" which indicated a head with "bloody hair" had been forcefully banged into the wall.  A "smear pattern" blood stain on the edge of the kitchen window was consistent with someone who had bloody hands and was "trying to prevent themselves from being pushed out the window by grabbing the side of the wall."  Drops of blood were also found directly below the kitchen window sill that were indicative of a bloody face or head held over the window.  Also visible on the exterior wall of the adjacent building, about five feet away, was a "glob of blood" that had been projected with considerable force.

Documents with defendant's and the victim's names on them were found in the apartment.  Other items also seized from the apartment that the officers believed belonged to defendant were a blood-stained Nike T-shirt, a jacket, a black glove, pills and other medication, a cell phone, a syringe, and a watch with blood on it.  [FN3]

    FN3  The victim's daughter testified that the watch belonged to defendant.

Analysis of Sherry's blood-stained T-shirt found in the apartment landing area near her revealed a mixture of

United States District Court
For the Northern District of California

4

DNA from both the victim and defendant.  A Nike T-shirt seized from the floor of the apartment contained defendant's DNA as the "major component" on the inside of the rear collar, indicating that he was the "habitual user" of the shirt.  "[E]xtensive blood staining" on the "upper left-front panel" of the Nike T-shirt contained the victim's DNA.  The blood stains on the front of the Nike T-shirt were of two types: a "three-finger contact pattern" of blood transfer with the fingers facing upward; and drops of blood in a "medium velocity impact spatter."  An expert offered the opinion that the finger pattern occurred when the victim's bloody fingers touched defendant's chest while the shirt was being worn.  The drops of blood appeared to be from a source standing in front of the shirt, consistent with defendant punching or hitting the victim.  Three "long marks" of blood stain transfer patterns were also observed on the inside of the Nike T-shirt, suggestive of "the shirt being taken off" by someone with bloody fingers.

An autopsy of the victim revealed that she died of "multiple blunt traumatic injuries" to the "head, torso and extremities." . . . The coroner testified that . . . the manner of death was homicide, not suicide or accident.

The prosecution also adduced testimony from defendant's [sic] daughter Ashley Davis, who visited her mother at her apartment the evening before she died.  Ashley testified that the apartment "was fine," with no blood on the walls, and Sherry "looked normal."  According to Ashley, Sherry was "leaving" defendant, and planning to move with her to Florida.  Sherry had packed some bags in the apartment in preparation for the move.  Ashley testified that the victim diligently took her prescribed medication for bipolar disorder, and was not suicidal.

Evidence related to other prior acts of domestic violence committed against the victim by defendant was also presented.

. . .

Sherry made a [] 911 call to the police from her Hyde Street apartment on October 14, 2005, just a few weeks before she was killed.  Ashley was present in the apartment when the call was made.  Just before Sherry called the police, Ashley observed defendant park his car on the side of the apartment building and yell to Sherry that he "was going to find her" and "do something to her" or have "other people do stuff to her."  Sherry was "scared" and called 911.  In the 911 call,  [FN4] Sherry told the operator that defendant was outside her apartment building, "hollering" and "threatening" her. She added that defendant was "really mad," and could

"get inside the building" and into her apartment. Sherry expressed that she was "scared" defendant was "going to try to hurt" her, and asked for police officers to "hurry."

FN4  An audiotape of the 911 call was played for the jury.

Ex. B at 1-6 (footnotes in original).

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal

principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.  Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the highest court to issue a reasoned decision on the Confrontation Clause claim is the California Court of Appeal and the highest court to issue a reasoned decision on the Brady and ineffective assistance of counsel claims is the Superior Court.

DISCUSSION

I. Confrontation Clause Claim

Petitioner, citing Crawford v. Washington, argues that the trial court violated his due process and confrontation rights by

admitting testimony that the victim, Sherry Davis, had identified him in Seattle in 1997 as the person who punched her in the face.

A. Federal Authority

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id.; see Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).

The Confrontation Clause applies to all "testimonial" statements. Crawford, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51. The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. Id. at 50-51.

Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendant had a prior opportunity to cross-examine the witnesses. Id. at 59. When the

primary purpose of taking an out-of-court statement is to create
an out-of-court substitute for trial testimony, the statement is
testimonial hearsay and <u>Crawford</u> applies.  <u>Michigan v. Bryant</u>, 131
S. Ct. 1143, 1155 (2011).  When that was not the primary purpose,
"the admissibility of a statement is the concern of state and
federal rules of evidence, not the Confrontation Clause."  <u>Bryant</u>,
131 S. Ct. at 1155.  The formality of the interrogation, or the
lack of it, may inform the court's inquiry as to its "primary
purpose."  <u>Id.</u> at 1160.  The primary purpose of a statement is
determined objectively.  <u>United States v. Rojas-Pedroza</u>, 716 F.3d
1253, 1267 (9th Cir. 2013).  Thus, "'the relevant inquiry is not
the subjective or actual purpose of the individuals involved in a
particular encounter, but rather the purpose that reasonable
participants would have had, as ascertained from the individuals'
statements and actions and the circumstances in which the
encounter occurred.'"  <u>Id.</u> (quoting <u>Bryant</u>, 131 S. Ct. at 1156).
"Statements are nontestimonial when made in the course of police
interrogation under circumstances objectively indicating that the
primary purpose of the interrogation is to enable police
assistance to meet an ongoing emergency."  <u>Davis v. Washington</u>,
547 U.S. 813, 821-23; 826-29 (2006)(holding that a victim's
initial statements in response to a 911 operator's interrogation
were not testimonial because the elicited statements, i.e., naming
her assailant, were necessary to resolve the present emergency).
"They are testimonial when the circumstances objectively indicate
that there is no such ongoing emergency, and that the primary
purpose of the interrogation is to establish or prove past events
potentially relevant to later criminal prosecution."  <u>Id.</u> at 821-

23; 830-31 (holding that statements made by a domestic battery victim in an affidavit given to police officers at the scene were testimonial because they memorialized what had already happened and did precisely what a witness does on direct examination).

A showing of constitutional error under the Sixth Amendment only merits habeas relief if the error was not harmless, that is, if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Holley v. Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

B. Factual Background

The prosecutor filed a pretrial motion to admit prior incidents of domestic violence.  CT at 81-102.  The only incident at issue is Sherry Davis's identification of Petitioner in Seattle in 1997.  At the hearing on the motion, the prosecutor presented the testimony of Seattle Police Officer Jung Trinh.  RT at 14. Officer Trinh testified to the following:

On November 9, 1997, at 4:46 a.m., he was dispatched to investigate a "fight disturbance."  RT at 15-16.  He drove to an Aurora Avenue motel and saw a woman walking just south of the motel.  RT at 17.  The woman was crying, had a bloody mouth, a cut to the right side of her head and a bruise on her left wrist.  RT at 17, 20.  The woman said "her boyfriend, [Petitioner], had punched her."  RT at 19.  She described Petitioner to Officer Trinh.  RT at 20.  Officer Trinh put out a description of Petitioner over the radio.  RT at 20, 38.  The woman identified herself as Sherry Akers, which was Sherry Davis' name at that time.  RT at 21.  When Officer Trinh asked Sherry what happened,

10

she verbally described the circumstances of the assault and then wrote out a statement in her motel room after paramedics had examined and cleared her. RT at 22, 32-34. After writing out her statement, Sherry asked to go to a woman's shelter. RT at 35. En route to the woman's shelter in Officer Trinh's car, Sherry saw Petitioner on the street and pointed him out to Officer Trinh. RT at 35. After pointing him out, Sherry laid down across the back seat, appearing to hide from Petitioner. RT at 36. Officer Trinh continued driving southbound, then completed a u-turn, contacted Petitioner and arrested him. RT at 36-37.

Citing <u>Crawford v. Washington</u>, defense counsel argued the statements were testimonial because they were given to an investigating officer and the written statement, at least, was to be included in a police report. RT at 130-33. Defense counsel conceded Sherry's initial statement to Officer Trinh, that she had been punched by her boyfriend, was nontestimonial and, thus, admissible. RT at 134.

The trial court ruled as follows:

> With respect to the Seattle incident, the analysis, I believe, is that the initial communication between the officer and Ms. Davis was nontestimonial in nature in that it was communication which was intended to determine what was going on at that point in time. And that would be true through and including the interaction with the paramedics, . . . But, I believe that when the officer and Ms. Davis went to the motel room and had a discussion about what had happened previous to the time that the officer arrived, that that is an out-of-court analog to in-court testimony, and it is testimonial in nature and, therefore, <u>Crawford</u> applies, both to the oral statements, and I think, absolutely clearly, to the written statements because the officer testified that he told Ms. Davis prior to the time that she wrote the statement out that it would be included in a police report, reviewed by a prosecutor, and perhaps used in court. So that is very clear.

11

> Now, we have an interesting twist, because, generally, when
> we get to that point in time where <u>Crawford</u> applies, it
> applies from that point forward.  Here, though, Ms. Davis
> gave both a written and oral statement in the motel room.
> And then the officer and Ms. Davis determined that it would
> be appropriate for her to be transported to a shelter for
> domestic violence victims.
>
> So Ms. Davis rode in the patrol car with the officer.  They
> were not looking for Mr. Green.  They were on the way to the
> shelter.  And on the way to the shelter, fortuitously, Ms.
> Davis spotted Mr. Green.  And I think, clearly, based on the
> testimony of the officer, Ms. Davis was surprised and upset
> upon seeing Mr. Green, identified him to the officer, and
> then immediately lay down abruptly, flat on the car seat so
> that Mr. Green could not see her.
>
> That suggests two things.  Number one, that she was stressed
> by the fact that she saw Mr. Green and, therefore, the
> hearsay exception would apply.  And, second, that what she
> told the officer at that point in time was intended to deal
> with an immediate situation, that is, the identification and
> detention of Mr. Green, as opposed to something that happened
> in the past.  So it's my view that Crawford does not apply to
> that interaction, and that the communication between Ms.
> Davis and the officer at that point would be admissible.

RT at 261-63.

C. Court of Appeal Opinion

The California Court of Appeal rejected this claim as

follows:

> The crucial issue before us is whether Sherry's
> identification of defendant while riding in the police car
> was a testimonial statement within the meaning of <u>Crawford</u>.
>
> . . .
>
> Defendant . . . points out that when "this interaction
> occurred, any emergency situation had passed."  Sherry was no
> longer "vulnerable to any further attack," and no ongoing
> crisis existed.  He submits that the sole purpose of the
> identification evidence was to facilitate his prosecution for
> the assault, which he claims is the "very essence of a
> 'testimonial' communication in the context of the <u>Crawford</u>
> doctrine."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

We find that the identification evidence is a nontestimonial statement within the meaning of <u>Crawford</u> and <u>Davis</u>. The statement by Sherry was made immediately following the officer's response to her 911 call. Defendant, the suspected perpetrator of the assault, was still at the scene of the crime, just outside the victim's residence. Although the victim was secure in the police vehicle, she continued to express fear of defendant and hid from his view.

The fact that the victim is no longer in immediate danger is not dispositive to our <u>Crawford</u> analysis. More significant to us is the purpose of the identification under the circumstances. The exclamation of identification was quite brief, and the officer did not solicit an account of the events or seek to discover any details of the assault. As we view the record, the identification was not obtained as part of an effort to collect evidence to establish or prove past facts for prosecutorial use, but rather to facilitate defendant's immediate apprehension by the dispatched officer. [citations omitted]. No formality or solemnity was associated with the identification evidence. [citations omitted]. The officer was not engaged in the process of collecting evidence, but instead was transporting the victim to a place of safety. The utterance was spontaneous and unsolicited; the victim was a passenger in the patrol car going to a shelter. The victim's identification of defendant was nontestimonial under <u>Crawford</u>, and thus was properly admitted as evidence without violation of defendant's right to confrontation.

Ex. B at 7-9.

D. Analysis

As presented in the Court of Appeal's reasonable opinion, Sherry's[1] identification of Petitioner was not testimonial evidence. To determine if a statement is testimonial and, thus, barred by <u>Crawford</u>, the inquiry focuses on the purpose that reasonable participants would have under the circumstances. <u>See</u> <u>Rojas-Pedroza</u>, 716 F.3d at 1267. At the time Sherry identified Petitioner, she had finished providing to Officer Trinh her verbal and written statements about how Petitioner punched her and they

---

[1] The Court will continue the Court of Appeal's convention of referring to the victim as "Sherry."

United States District Court
For the Northern District of California

were enroute to a battered women's shelter, where Sherry was going to stay.  That Sherry happened to see Petitioner on the street as they were driving to the woman's shelter was accidental.  Officer Trinh was no longer questioning Sherry about the incident and they were not looking for Petitioner.  Sherry's identification was uttered in surprise and fear.  If there was any purpose to Sherry's identification, other than a purely spontaneous utterance, it was to enable Officer Trinh to apprehend Petitioner, which he did.  A reasonable person in Sherry and the officer's position, would not have thought Sherry's brief statement was meant to establish or prove past events; a reasonable person in their position would conclude it was a statement describing what was taking place at the present moment.  Thus, the statement was nontestimonial.  The trial court's decision to admit it into evidence as not violative of Petitioner's due process or confrontation rights was not unreasonable.

Petitioner argues that, because there was no emergency at the time Sherry identified him, her statement was testimonial. However, the fact that the danger was over is not dispositive of a determination under Crawford.  In Davis, the Supreme Court addressed a specific situation where a 911 operator was questioning a victim regarding an ongoing emergency situation. Davis, 547 U.S. at 822-23.  The Court held the 911 operator's questioning was not testimonial and distinguished it from the police interrogation in Crawford, which was testimonial.  Id. at 826 (citing Crawford, 541 U.S. at 53).  The Davis Court clarified that what it had in mind in Crawford were interrogations directed at establishing the facts of a past crime in order to identify or

to provide evidence to convict the perpetrator. Davis, 547 U.S. at 826-27. In contrast, the purpose of the 911 call in Davis was to describe current circumstances requiring police assistance. Id. at 827. Sherry's identification of Petitioner when she happened to see him on the street enroute to the battered women's shelter was similar to the 911 call in Davis because its purpose was not to establish facts of a past crime to provide evidence at a trial, but was to describe current circumstances requiring police assistance.

Furthermore, even if a Confrontation Clause violation occurred, for the following reasons, it did not have a substantial and injurious effect in determining the jury's verdict. See Brecht, 507 U.S. at 637.

First, Sherry's identification of Petitioner enroute to the battered women's shelter was cumulative to her earlier statement to Officer Trinh when he first contacted her. In her initial contact with Officer Trinh, Sherry described the perpetrator as her boyfriend who had punched her. Petitioner concedes this identification is admissible. Also, the jury heard evidence of three other incidents of domestic abuse perpetrated by Petitioner on Sherry, which Petitioner does not challenge. For this reason alone, Sherry's identification of Petitioner when she saw him on the street while going to the women's shelter was harmless.

Second, there was overwhelming evidence of Petitioner's guilt. Petitioner had a motive for killing Sherry——she was leaving him and had her bag packed to move to Florida. Physical evidence included Petitioner's Nike T-shirt, which had Sherry's blood on it, and Petitioner's blood and DNA on Sherry's shirt. RT

**United States District Court**
For the Northern District of California

at 904, 1005-06.  Ruth Marest, who lived in the apartment next door, heard Petitioner and the victim arguing at 2:30 a.m. and again at 2:30 p.m.  RT at 653.  She heard scuffling and a woman saying, "[H]elp me, help me.  Please help me."  RT at 647-49. From her kitchen window, Marest saw a woman's head against the window sill next door, moving back and forth.  RT at 648.  She saw "some arms" pushing the woman out the window.  RT at 651.  After the victim was pushed out the window, Jeremy Brady saw the outline of a male's face looking out the window and heard the male say, "Take that, you fucking bitch."  RT at 721.  Brady described the male as an African American male with a medium build, short hair and middle aged.  RT at 722.  This fit Petitioner's description. At the scene of the crime, police officers found no signs of an apartment break-in.  RT at 668.

Petitioner argues that the case against him was weak primarily because no direct evidence linked him to the crime.  He points out that he was not seen entering or leaving the apartment and that there were reasonable explanations for his DNA and fingerprint evidence in the apartment because he was frequently there.  He postulates that the Nike t-shirt with both his and Sherry's blood on it is not inculpatory because it could have been left on the floor of the apartment and then touched Sherry or the perpetrator during the assault.

Petitioner's speculation about his blood, fingerprints and DNA being found at the scene of the crime is unpersuasive.  The blood and DNA evidence and witnesses' testimony show that the prosecutor's case against Petitioner was strong.  In his closing argument, defense counsel argued that, because the prosecutor had

not tested all the blood and DNA evidence, an unidentified person had killed Sherry.  However, defense counsel's argument regarding an unidentified perpetrator was insufficient to overcome the above-mentioned evidence pointing to Petitioner's guilt.

Given this strong evidence establishing Petitioner's guilt, any error in admitting Sherry's identification of Petitioner when she saw him as she was being driven to the women's shelter did not have a substantial and injurious effect or influence on the jury's verdict.

The Court of Appeal's rejection of this claim was not contrary to or an unreasonable application of Supreme Court authority.  Habeas relief on this claim is denied.

## II. Brady Claim

Petitioner argues that the prosecutor failed to disclose evidence of "numerous" unknown latent fingerprints lifted from the victim's apartment and failed to disclose that the government's key percipient witness, Ruth Marest, was diagnosed with bipolar disorder in 1978.  Pet'n at 6b.

### A. Federal Authority

In order to succeed under Brady v. Maryland, 373 U.S. 83 (1963), a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material.  Banks v. Dretke, 540 U.S. 668, 691 (2004).

Under Brady, the terms "material" and "prejudicial" have the same meaning.  United States v. Kohring, 637 F.3d 895, 902 n.1 (9th Cir. 2011).  Evidence is material if "there is a reasonable

United States District Court
For the Northern District of California

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  However, the mere possibility that undisclosed information might have been helpful to the defense or might have affected the outcome of the trial does not establish materiality under Brady.  United States v. Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013).

B. Analysis

The Superior Court succinctly denied this claim stating, "Petitioner's Brady argument is without merit because Petitioner has not shown that any evidence was suppressed by the People or that Petitioner was prejudiced."  Ex. D, Ex. 1 (In the Matter of the Application of Frank Green, Writ Number 6298 (San Francisco Superior Court, Jul 26, 2011)).  The Superior Court's opinion was not objectively unreasonable.

1. Fingerprint Evidence

In his federal petition, to support the claim that the prosecutor withheld fingerprint evidence, Petitioner cites the testimony of fingerprint experts indicating that two latent fingerprints were collected from Sherry's apartment.  See RT at 863, 923-24.  One fingerprint was taken from a Royal Dansk Wafer can and was identified as belonging to Petitioner.  RT at 863.

United States District Court
For the Northern District of California

Tests of the second fingerprint taken from the side of a dresser showed that it did not belong to the victim or to Petitioner, but it was not of sufficient quality to determine if it was a match for any other individual.  Id.

Respondent cites defense counsel's statements during a hearing on pretrial motions and during his closing argument to argue that defense counsel knew of the latent fingerprints and, thus, the prosecutor did not withhold them.  Petitioner argues that, if his counsel had known about these fingerprints earlier, he would have investigated the source to mount a defense of third-party culpability.  Whether the prosecutor withheld these two latent fingerprints from defense counsel is not dispositive because they were not material under Brady.  Because the fingerprint on the wafer can belonged to Petitioner, it was not exculpatory.  Because the fingerprint from the dresser was not of sufficient quality to determine if it belonged to a third party, it was not exculpatory because it could not have implicated another person even if defense counsel had it tested.  Because the evidence was not exculpatory, it was not material and, thus, no Brady violation occurred even if the prosecutor did not reveal this information until the fingerprint experts testified.

2. Prosecutor Witness Ruth Marest's Bipolar Disorder

Several days before Marest was scheduled to testify, she informed the prosecutor that for many years she had suffered from a bipolar disorder and was on medication for it.  RT at 608-13. The prosecutor informed the court of Marest's bipolar disorder at an in camera hearing; the court ordered her to disclose this fact to the defense and she did so.  RT 612-13.  Immediately after the

United States District Court
For the Northern District of California

prosecutor called Marest as a witness, she asked Marest about her bipolar disorder and if she thought it affected her ability to perceive events or her ability to testify truthfully. RT at 647. Marest answered that it did not affect her ability to perceive events or to testify truthfully. Id.

Petitioner contends that, if his counsel had known in advance of the trial that Marest was "mentally-ill" and that her medication had "pernicious side-effects," he would have procured an expert witness to testify about how Marest's "mental disorder" and medication affected her perception, credibility and cognitive functioning. Petitioner contends it was important to impeach Marest in this manner because she was the prosecutor's most important witness.

However, Marest's perception and cognitive functioning were put in question without the testimony of an expert witness. On direct examination Marest testified that, on the day of the incident, although she heard Petitioner and Sherry arguing, she never saw Petitioner going in or out of Sherry's apartment, she never saw the face of the woman at the window and, after the incident, she heard someone who sounded like Sherry say, "Oh, my god, what did you do? What did you do?" RT at 654. Thus, even on direct examination, Marest's perception and cognitive functioning were discredited because she thought she heard Sherry speak, when the physical evidence showed that Sherry was the person who had been pushed or fallen from the apartment window.

On cross-examination, defense counsel elicited Marest's testimony that, in the statement she wrote for the police immediately after the incident, she indicated that she had heard a

different woman arguing with Petitioner that afternoon, that
Sherry had not been the person arguing with Petitioner.  RT at
656.  Defense counsel also elicited Marest's testimony that she
had written in her statement that she never saw any hands pushing
the woman out the window and did not know if the woman was pushed
or fell, even though at trial she testified that she did see hands
pushing the woman.  Id.  During the course of his cross-
examination, defense counsel discredited Marest's cognition and
her ability to recall past events in other ways.  RT at 654-62.

This evidence shows that there was no Brady violation.
First, the prosecutor disclosed to the defense as soon as she
could that, for many years, Marest suffered from a bipolar
disorder and was taking medication for it.  Second, Marest's
disorder was put before the jury so the jury could determine for
itself if the disorder affected Marest's perception or memory.
Finally, in his cross-examination of Marest, defense counsel
impeached Marest with her prior inconsistent statements,
demonstrating that she had memory and perception difficulties.
Therefore, any testimony from an expert regarding Marest's bipolar
disorder and her medication would have been cumulative to what the
jury already knew about Marest and, thus, was not material.  For
all of these reasons, the Superior Court's denial of Petitioner's
claim that the prosecutor's disclosure of Marest's bipolar
disorder just before trial constituted a Brady violation was not
objectively unreasonable.

III. Ineffective Assistance of Counsel

Petitioner contends his trial counsel was ineffective because
he failed to test the government's "forensic evidence" of blood on

United States District Court
For the Northern District of California

walls and clothes and fingerprints in Sherry's apartment and failed to interview prosecution witnesses Ruth Marest and Jeremy Brady.  Petition at 6e; Traverse at 18.  Petitioner contends his appellate counsel was ineffective for failing to raise on appeal claims of a Brady violation and of ineffective assistance of trial counsel.

A. Federal Authority

1. Trial Counsel

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 131 S. Ct. 770, 792 (2011) (citing Strickland, 466 U.S. at 693).

Counsel is empowered to make strategic decisions after reasonable investigation or to make a reasonable decision that a particular investigation is unnecessary.  Jennings v. Woodford, 290 F.2d 1006, 1014 (9th Cir. 2002).  There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer

neglect." Harrington v. Richter, 131 S. Ct. 770, 790 (2011)
(citations omitted). "Strickland specifically commands that a
court 'must indulge [the] strong presumption' that counsel 'made
all significant decisions in the exercise of reasonable
professional judgment.'" Cullen v. Pinholster, 131 S. Ct. 1388,
1407 (2011) (quoting Strickland, 466 U.S. at 689-90).

    2. Appellate Counsel

The Due Process Clause of the Fourteenth Amendment guarantees
a criminal defendant the effective assistance of counsel on his
first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 391-405
(1985). Claims of ineffective assistance of appellate counsel are
also reviewed according to the standard set out in Strickland.
Smith v. Robbins, 528 U.S. 259, 285 (2000). First, the petitioner
must show that counsel's performance was objectively unreasonable,
which in the appellate context requires the petitioner to
demonstrate that counsel acted unreasonably in failing to discover
and brief a meritorious issue. Id. Second, the petitioner must
show prejudice, which in this context means that the petitioner
must demonstrate a reasonable probability that, but for appellate
counsel's failure to raise the issue, the petitioner would have
prevailed in his appeal. Id. Appellate counsel does not have a
constitutional duty to raise every nonfrivolous issue requested by
the defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983). The
weeding out of weaker issues is widely recognized as one of the
hallmarks of effective appellate advocacy. Miller v. Keeney, 882
F.2d 1428, 1434 (9th Cir. 1989). Appellate counsel therefore will
frequently remain above an objective standard of competence and
have caused his client no prejudice for the same reason—because
he declined to raise a weak issue. Id.

B. Analysis

Petitioner raised this claim in his state habeas petitions. A written decision was issued only by the Superior Court. The Superior Court noted the petition was defective because, although it cited to trial records, it failed to provide the court with supporting transcripts that would enable an informed review. The Superior Court denied the claim of ineffective assistance of trial counsel on the ground that Petitioner had failed to show that "trial counsel's performance was deficient or that any performance prejudiced the defense" and denied the claim of ineffective assistance of appellate counsel on the ground that "Petitioner has presented only conclusory allegations without any explanation of a basis for relief." Ex. D, Ex. 2 at 2.

The Superior Court's denial of these claims was not objectively unreasonable. Although defense counsel did not test the forensic evidence, the record shows that he made effective strategic decisions about it as evidenced by his closing argument, which he began by answering the prosecutor's question of who else but Petitioner could have pushed Sherry out the window:

> Who else? Who else? How about the person who left the bloody palm print on the wall that's in this envelope that was so important that the inspectors cut it out of the wall, that Ms. Garcia (prosecutor) tried to say could have been left by protein or hamburger. But Inspector Gee, who was in charge of the crime scene, said it was in blood, in blood, a palm print which could be compared to Mr. Green and to Ms. Davis. Neither one of them . . . left the palm print in blood on that wall.

> Who else? I don't know but I know it was somebody else. I appreciate the opportunity to answer that question.

> The issue is really, Ladies and Gentlemen, you know, is there reasonable doubt here? That's what we're talking about.

> . . .

United States District Court
For the Northern District of California

The law very carefully says that you look at each piece of evidence independently.  And that evidence in this particular case is what's called circumstantial evidence, not direct evidence.  Nobody saw anybody actually getting pushed out of a window.  But there are facts which Ms. Garcia says conclude that, in fact Mr. Green did it.

However, let's put the bloody palm print aside for a minute, because the prosecution certainly ignored that fact.  She never addressed it in her statement to us.  She tried very hard to show us that it wasn't in blood, but of course we know it was right there with the other bloody patterns.  But the D.A. didn't look at that when they initially arrested Mr. Green.

. . .

If there is blood that belongs to another person, there is a bloody palm print on the wall that belongs to another person, isn't it incumbent upon the inspector to really dig in here, but perhaps, because of the inexperience, or because he was too busy, or because it happened in section eight housing in the tenderloin, or because he waited almost a year, ten days shy of a year, to do his report, he missed this.  He just assumed, as everyone else didn't, because of the prior history between Mr. Green and Ms. Davis, that Mr. Green was the suspect.  And he didn't fulfill his role as investigator.

. . .

And what did they find when they test this other evidence, evidence that they never had when they decided to arrest him? Is lo and behold, somebody else's DNA in blood.

. . .

There has been a little something that has been deceptive here, which is that when we see the blood on the stair, the police took photographs of it, and they took swabs of it. These are on the outside stairs.  Remember, it was on the outside of apartment 602 on the elevator.  It was on the fourth floor.  There was a bloody tissue that was found on the fourth floor.  It was down in the lobby. . . It looks like the perpetrator left and went down.  None of those stains were ever tested for DNA; however, Ms. Garcia's response was, you know what?  Isn't it common . . . to find blood in Tenderloin apartments? . . . Well, you know, that's a stereotype. . . . To say that is unrelated to this crime, where it is—the bloody—a blood—blood is outside the

apartment, right on the wall by the elevator.  It's in the
stairwell.  It's photographed.

. . .

Why didn't she (prosecutor) test the DNA?  Why didn't you
test the DNA?  Because it's expensive $800.  $800.  [sic]
But, you know what?  They spent enough money flying everybody
down here, from southern California . . . for the officer in
Seattle to come here, for Jeremy Brady to come from Texas.
$800 is not the reason not to test the evidence.

And, by the way, do not let her say, do not let her say,
[sic] why didn't the defense do it?  Because you know better.
You know the defense has no obligation to do anything except
sit there and make them prove their case.

RT at 1314-15; 1321-22; 1332-1334.

These excerpts from defense counsel's closing argument show
that he strategically used the fact that the prosecutor did not
test all the forensic evidence to raise reasonable doubt with the
jury.  It appears that counsel decided that focusing on the
prosecutor's failure to test all the blood and fingerprints was a
more powerful argument for raising reasonable doubt with the jury
than if the defense had tested the evidence.  Counsel's strategic
decision cannot form the basis of deficient performance.  See
Pinholster, 131 S. Ct. at 1407 (no deficient performance where
counsel makes reasonable strategic decisions that makes particular
investigation unnecessary).

In regard to the claim that counsel failed to interview Ruth
Marest, as discussed above, counsel raised questions regarding her
perception and memory in his cross-examination of her.  See RT at
654-62.  Similarly, in cross-examining Jeremy Brady, defense
counsel impeached him with his prior inconsistent statements to
the police and the grand jury.  RT at 723-28; 731-34.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Because counsel competently cross-examined and impeached Marest and Brady, Petitioner cannot show counsel's performance was deficient or prejudicial in that regard. The Superior Court's denial of this claim was not objectively unreasonable.

The claim against appellate counsel fails because, as discussed above, there was no Brady violation and trial counsel's performance was not ineffective. Appellate counsel cannot be criticized for failing to appeal frivolous claims. The Superior Court's denial of this claim was not objectively unreasonable.

Habeas relief on the claims of ineffective assistance of trial and appellate counsel is denied.

IV. Evidentiary Hearing

Petitioner requests an evidentiary hearing on the suppressed Brady material and on the evidence trial counsel failed to investigate. Traverse at 24. Petitioner is entitled to an evidentiary hearing on disputed facts where his allegations, if proven, would entitle him to relief. Perez v. Rosario, 459 F.3d 943, 954 n.5 (9th Cir. 2006); Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995).

An evidentiary hearing is not required here. As discussed above, Petitioner has not shown the allegedly withheld evidence was material under Brady and he has not shown deficient performance or prejudice based on counsel's failure to investigate the forensic evidence. Accordingly, Petitioner's request for an evidentiary hearing is denied. See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (no hearing required if allegations, viewed against the record, fail to state a claim for relief).

V. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. 28 U.S.C. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists would not find its ruling on any of Petitioner's claims debatable or wrong. Therefore, a certificate of appealability is denied.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The request for an evidentiary hearing is denied.

1    2. The petition for a writ of habeas corpus is denied.

2    3. The Clerk of the Court shall enter a separate judgment and

3    close the file.

4    4. A certificate of appealability is denied.

5    IT IS SO ORDERED.

6

7    Dated:  7/28/2014                    

8                                         CLAUDIA WILKEN
                                          UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28